Morning is 417-0431, People v. Davis. For the appellant is Attorney Daniel Mellon. Is that pronounced correctly? Correct. Mellon? Yes. Thank you. And for appellee is Mr. McNeil. Mr. Mellon, you may proceed, sir. Thank you. May I speak to the court? Yes. My name is Daniel Mellon with the State Health Inspector's Office, and I represent Humane Davis. There's obviously one issue before this court today, and that's whether the trial judge wrongly denied the defense's motion to suppress the statements Humane gave to the police on February 7, 8, and 10 of 2014. We made a number of arguments in our briefs to why all these statements were invisible. But today, I just intend to focus on two points. First, that the February 7th interrogation, the first interrogation had become custodial by the time Jermaine invoked his right to silence. And second, that the police did not scrupulously honor that right, and Jermaine never re-initiated the interrogation. So all of his statements after that point should have been suppressed. As to the custody issue, this is, the court is well aware, there's two-part tests to determine whether or not a defendant is in custody for Miranda purposes during the interrogation. First, you look to the circumstances surrounding the interrogation, and then you consider whether a reasonable person in those circumstances would have felt that he could terminate the interrogation. So as for the circumstances here, the setting was in a police station in the interrogation room at the Springfield Police Department. This court has repeatedly re-emphasized that this is an inherently custodial setting. It's a very small interrogation room. The police testified he had to be escorted to the room. He wouldn't have been allowed to leave on his own. Jermaine was seated at a table. His keys and cell phone were in front of him. The table was in between him and the door. The officers were armed. It was the day he had to escort the power to the other room. He drove to the police station. He drove to the police station. He used an acquaintance's car. Leading up to the interrogation, the police contacted his parole agent, and they said, why don't you follow us to the police station? And he drove someone else's car to the police station. What did the trial court rule in this case? Court ruled, if I understood correctly, that the February 10 interrogation was admissible, but the earlier ones were not. Trial court ruled that. Trial court allowed all seats in. Trial court what? Ruled allowed all seats in. OK. And your position is none of them are in, but we're not limited to that. We could. Let's assume we were to decide that some portion of the first two were improperly admitted. The question is then, what about February 10? In fact, in the February 10 statements, by far, that's essentially the confession. So I suppose what I'm asking is this. If the statements of February 7 and 8 were improper, it was an improper custodial interrogation, and that he indicated he wanted to stop it, and it wasn't respected. How long does the taint of the police action with regard to that affect any subsequent efforts to further interrogate the defendant? That is, when, if ever, can the cops go back and talk to them? Supreme Court seems to say it's not forever. It isn't. The taint isn't forever. But it's not totally clear how long it should be, and what factors we look to. What about that? What factors? You look to the same factors as you would interrogate, to see what interrogation following the Miranda violation is the first you look. Did they scrupulously honor the rights? No. Assuming, at least. Yeah, let's assume. Let's assume, no, he didn't ask for it. To make it even more clear, the first part of February 7, where he drives himself there, and where it's, for lack of a better word to put it, in the statement, the questioning is inquisitive as opposed to accusatory. There seems to be some point in February 7 where that changes. For purposes of my question, let's assume thereafter, in February 7 and February 8, we have custodial interrogations that are not respected as an exercise of his rights, et cetera. How do we then analyze that with regard to the interrogation February 10, which is several hours later? At least 48, I guess. Yes. And he's still in custody. The same cops go and talk to him. And they give him his new Miranda warnings. And he makes it clear he understands that, yeah, these are new Miranda warnings. But of course, the problem is, and it's implicit in the argument, and it's a good one, that the difficulty is, hey, these are the same cops. They gave me the same warnings. I made noises about, I don't want to talk to her, or maybe I should get a lawyer, or whatever. And they ignored all of it. So I suppose the question is, what's the value at this point from February 10, trying to view this objectively and subjectively both, objectively from any reasonable point, or subjectively from this particular defendant, to think, what do these warnings really matter, this advising him of his rights, when the same cops ignored him in the past? Absolutely. The time, yes. The time that elapsed, it's a factor that favors admission of subsequent statements. But it's only one factor. And I think what's much more, this court, we would ask this court to pay particular attention to the fourth factor. This was the same exact, this interrogation was about the same exact offenses as was all along. When you view this in time. Well, the closing right there, you're right. The defendant really changes his story, and essentially is now giving it all up. And it's rather, I'm not saying this, but it would be a different case and a stronger case for the defense if, on February 7 or February 8, when there was a violation of Miranda. Let's assume that there's a violation at some point. He had then confessed. He had then made the same admissions. Yeah, I did it. What happened that he did it on February 10? Because then, they go back to February 10, and this is simply a reiteration of what he had earlier said. And he's already given up, and there's no reason to think talking about it more will make any difference. That's not what happened here. So he talked to him on February 7 and 8, some incriminating stuff in the sense he's there, and he saw what was happening. But certainly, rather less, a lot less, than what he said on February 10. How does that affect our analysis? I don't know if I would characterize it as a lot less. He did, by the end of the first day, February 7, implicate himself in the robbery, which would implicate himself in the murder. And I would say it was methodical. Yeah, but that's a lawyer's assessment. I mean, we all understand felony murder, and maybe some in the streets, there's some sense of this. But obviously, in his case, he was a big difference, because he didn't give it up. But the police, they knew what he had given up at that point. And the police were very methodical from the very beginning. They followed the playbook he invoked, and they seemed to get up and understand that, OK, game over. I mean, this is our point we have to leave. But no, they intended to wear him down until they obtained the confession that they got. And the videotapes of the confession, which you can watch, they're in the records. For all that, it seems as if it's just one long interrogation that occurs over several days, only taking breaks to sleep. Well, from the 8th to the 10th, it was, what, 48 hours? Yeah. Now, we have a lot of cases on Miranda and this kind of stuff going on. Is there some discussion anywhere that talking about quantifying this time, gee, if it had been four or five days, it would have been better or different than just two days? Or what? I don't know if I've seen a case that quantifies it, because I don't know if it can be quantified. That's why the time that elapses is just one factor to determine whether or not that figure is true. What's the other factor? The other factor is, did they initially halt the initial interrogation? Did they simply do this in the office? Well, we assumed they did. They assumed. So that factor is off. Well, it's assumed that there was a violation, now what then? So focusing on February 10th. Correct. So then the second factor is, was he re-Miranda-ized before the subsequent interrogations? Again, ZDFs, he was re-Miranda-ized before the February 10th interrogation. During how much time it lasts, that is a factor that would favor admission of February 10th Why is that? Because case law says, just a mere couple of hours, two, three hours, four hours might be enough in order for a subsequent. OK, so what's that lead you with? That leads us to the fourth factor, and what was the nature of the subsequent interrogations? And that's when you look to, these are the same detectives that have interrogated him from the beginning, from 13 months earlier. So they start, same detectives, same room. They bring him in again, February 7th. They now get a little more formal. They Miranda-ize him. He invokes his rights. They ignore them, at least for purposes of this argument. They ignore his rights. They ignore his right to silence. And then that's when they really begin their strategic tactics of trying to wear him down. Well, if I understand your argument, you're saying there are four factors, and three of those favor admissibility of the February 10th statements. No, there's four factors. One is, did they do this in honor of his rights? So it's two to two, I see. Yes, it is two to two. So where does that leave us, then, if it's two to two? Well, I would say that because of the nature of how the interrogation unfolded from February 7th through February 10th, that factor, fourth factor, strongly favors us. We cite a case in First District, Flores, where it was the same exact scenario. It was two to two. But they look at the fact that his rights were not scrupulously honored, and then they look at the fact that the interrogation was about the same exact offense. They look at the fact, and here, in the same detectives, that in that case, it was a statement to a state attorney and it was a statement to detectives. So here, this even feels more, because it's the same detectives, same exact content, same exact offenses. Let me ask a question for the Miss Court. There's no dispute in the facts, is there? I mean, everyone is pretty much in agreement on what led up to the defendant being in jail and being questioned, and then, of course, there's the tape, which is not being disputed. So, when we talk about the no lower review, we're really addressing that issue of what does this all mean? And we have to decide that, and the question is, as the state argues, well, even if there's a problem with the statements in the 7th and 8th, that what happened there, and it's harmless beyond a reasonable doubt when you're evaluating February 10th stuff. First, a couple quick questions. The jury heard all of this. It's really the February 10th statements that are the most incriminating, where it's essentially a confession. I'm actually parsing this a little bit. Going back to February 7th and on February 8th, when the questioning became accusatory as opposed to really inquisitive, but let's assume that the defendant's responses were not honored, we had a violation thereafter occurred. To what extent, I'm playing this a little awkward, assume the February 10th stuff is properly admitted, to what extent is there a problem with the jury hearing what the defendant said was February 7th and 8th? Okay, just so I follow, assuming this court holds that February 7th and February 8th are inadmissible. Yes, and the jury shouldn't have heard it. And the jury shouldn't have heard it. But February 10th is admissible, so then the question is, what is the extent of the harm the defendant suffered by hearing, by having the jury hear the 7th and 8th statements, February 7th and 8th, when they properly heard the February 10th? You don't directly address this in a race, but I would argue hearing just the February 10th statements without hearing everything that led up to it. Well, they would have heard the first part of February 7th. They loved, well, they would have heard. Inquisitive as opposed to accusative. Yes, correct, I'm sorry. And so, yes, they would have heard the first part of February 7th, where it's you perhaps purchased a gun, we can link that to the murder. And then indication of right to silence. Everything comes out up to, in February 8th, they see him being re-branded as going to be confessing to the murder. 10th. Oh, 10th, I'm sorry. Yeah, 10th, he confesses to the murder. I mean, I would say that would be problematic because it wouldn't allow the jury to hear the context in which he did confess to the murder. Because the jury, I think, would be able to see for themselves the pressure and the tactics and the methods that the police applied. And that would then, the weight of the confession. I thought about the damage to the defendant. I'd be saying, gee, the jury should have heard him. And the jury would say, sure, put it all in. But essentially, it seems to me that, let's assume slight different facts here. When the statements become accusatory, the question becomes accusatory as opposed to inquisitive, so that he can conclude that the defendant's reference to I don't want to talk to you anymore, or if I think I need a lawyer, or whatever. Let's assume we, at that point, those statements should not have been admitted. And the trial court said, no, I'm not gonna let that slip in. Now we're just talking about the February 10th statement. Assuming the trial court says, oh, that was okay under the circumstances, I'm gonna let that in. How damaging is the stuff from the 7th and 8th that happened in this case, where we're saying trial court shouldn't have let it in, given the February 10th statement? I'm just trying to evaluate. I don't think you can argue that they are as damaging as the February 10th interrogation. The February 10th is where he lets it all out. He lets his guard completely down, and he confesses to. It seems to me, you're right, and I appreciate your candor, the February 10th stuff is really the confession of damaging stuff, and that the 7th and 8th statements thereafter would be probably harmless, but then we conclude that they're harmless there and beyond a reasonable doubt. That's what we'd have to do, I guess. I'm looking for the prejudice the defendant suffered, assuming the February 10th statement was properly admitted from the jury's hearing all February 8th and part of February 7th. The prejudice, well, I mean. What was that prejudice? The prejudice he does implicate himself. He puts himself on the side, he implicates himself in the offenses on both the 7th and 8th. But he's already done that in February 10th. Remember, that's already admitted. Yes. Properly. I would say that the jury should have heard the context. If they are gonna hear any sort of confession here, they should have heard the context and how it was broken down and taken out of it, and it's true, but I... I'll suggest something here that maybe you wanna offer up, and that is in the 7th and 8th interrogations, he set forth a particular version of the facts, which later he recanted. And so the jury, in hearing the interviews of the 7th and the 8th, they heard his various versions and flip-flops, and potentially that was damaging to the defendant, whereas had it only been the 10th, you wouldn't have had those prior inconsistencies demonstrated. Is that fair? Yes. Counsel, what day of the week was February 7th, 2014? I'm not certain. I ask that question because I'm curious how is it your client, who was arrested at the conclusion of the interview on February 7th, 2014, still did not have counsel by February 10th of 2014? He did ask for counsel. It's our opinion that he did ask for counsel. Had he been before a judge before February 10th? I believe he had been, yes. Huh. That's not an issue, I guess. That's not raising the briefs. All right. It seems odd to me. But, I mean, just to conclude, I would submit that February 10th is inadmissible for the same reasons as February 7th and February 8th. You acknowledge the Brownell case that the state cites, too, that there isn't a complete prohibition against subsequent interviews. And here, there was a substantial amount of time between the end of the February 8th interrogation and the February 10th interrogation. It's simply a matter of us determining whether or not it was sufficient in duration to allow for that interview to be admissible. Under Brownell, the other cases that speak to that, that fact that re-Mirandizing allows the police to discuss with the defendant the circumstances. All right. So, yeah, I'm out of time. Go ahead, Dan. I would suggest those cases are distinguishable because the police's conduct that occurred on the February 7th and February 8th rendered the Miranda warnings and the time lapse annulled by the time it came back to February 10th. Truman had no reason to believe his rights would be violated or his rights would be honored considering the conduct that led up to this. And this seemed to be just one long interrogation. I don't believe that this court's first amount to seven interrogations is enough to stand the test of time. There are no further questions. Well, there better be some more. We'll get a chance to address this again in rebuttal. Thank you. I'll state my first remarks. Okay. Mr. McNeil. Thank you. May it please the court, counsel, as for the arrest, he was arrested for possession of a weapon by a felon at the end of February 7th. He was not arrested for this, for the murder of the charge this year. So I don't know if the record will be fully established as to if he'd been in court on that charge  Well, if I'm following what you're saying is that he was arrested on unlawful use of a weapon by a felon. He had been to court on that and he had counsel on that, but that doesn't make any difference and the police can still come in and talk to him even though he has counsel. And you're arguing because there are two different charges there. Is that what the case law says on that? Well, that's what mostly the seminal case on the U.S. Supreme Court says. The factors that we're talking about, we're going to talk about him being under arrest, he was under arrest for a different charge. Yeah. Possession of a weapon. It was a different charge, but it was the same. It wasn't unlawful use, it was just unlawful possession. Well, didn't the Supreme Court say, the United States Supreme Court said many years ago that once the cat is out of the bag, you can't put the cat in the bag, and therefore any subsequent interrogation is tainted. Isn't that from the U.S. Supreme Court? Cat out of the bag case. Well, I think mostly it would refute that. By practical purposes, it limits Miranda, it limits, it says Miranda should not be taken literally to create a per se proscription for the inevitable future about any questioning by any other person. Well, so, the cops have arrested the guy for armed robbery and the Miranda rights. He exercises, I don't want to talk to you, but the FBI wants to come in and talk about totally unrelated and counterfeiting case. That's what they're really dealing with. Yeah, there's no problem with that. But as Justice Turner points out, this is just clever cops who are trying to hide the ball. This is an interrogation about the same factual context, and that the cops didn't charge him with murder at that point, though arguably they could have, since at the point, certainly at February 8th, he's talked about, probably even February 7th, enough for a felony murder. Yeah, I knew they were, what he was going to do. How does that excuse the notion that this is really the same interrogation? Well, I would argue that the police did see that it stayed on their case, even assuming he was in custody, which the trial court found he wasn't. And that was finding the fact entitled to that. Well, you say that, but that's the Gorman case. It's written 28 years ago, and... Was that your case? You bet, and it certainly was correct at the time, but I think, as the Supreme Court said, that we are now concluding motions to suppress generally that will, the findings of fact with regard to the defendant or the trial court makes, that's on the manifest way of the evidence, but the ultimate conclusion, custody is an ultimate conclusion with legal effect, that's reviewed to no vote. Well, either way, I think the trial court made the correct decision here. It laid out all the reasons why he wasn't in custody on February 7th, and we have to, it's not just a reasonable person in the defendant's position, it's a reasonable innocent person in the defendant's position. He'd been argued, he'd been interviewed in the same room by the same police officers. But the tone of this questioning changed rather dramatically at about the 90 minute mark, and, you know, it seems to me, you know, when you have to ask permission to do this and that, it sounds like the cops, this is, you're under, you're being in detention by the cops. That's, you're restricted. Well, the officers specifically said they weren't, that he wasn't under arrest. Well, you know, that was the thing that Gorman also addressed, that that's just so much blather, and the circumstances speak for themselves. You're not under arrest, but by the way, you're behind locked doors, and you have to ask to use this, and you go to the restroom, and you just can't walk out the door. You know, that, isn't that, you're in custody? Well, okay, assuming he's in custody, the, I'm sure your honors looked at the video, the police scrupulously honored his right to remain silent on February 7th. They, he said, I want, I think he even, he says, I want to use that right to stop talking. At that point, they don't ask him any more questions. They leave the room. The only question he asks is if he wants a cigarette. So he did. That, I mean, one guy does continue to talk to defendants about the case, about the circumstances of the case, but as soon as the defendant- Yeah, but what he says is what, he said he had done some research on him. What happened doesn't match you. He tells the defendant that maybe things might work out better for people that weren't necessarily the evil person in this. There was no intention for, there was no elicitation of incriminating statements by the defendant. It was finished. It was finished. Yeah, but that doesn't, there's no requirement that there be an intent to elicit or that the statements be elicited. The requirement is you stop asking questions. Isn't that it? Well, Justice Harris has just brought out a whole bunch of stuff that- They made those, those were the parting words, yes. Parting words? Yeah, they left the room after that. And then they come back and what happens then? They come back and give him a water bottle with a cigarette patch. And they say, okay, Charlie, you're free to leave? Oh, well, that's not what happened. They don't say anything. Why was he still there? And what were they, what was he doing still there? He re-initiates contact with them minutes later. How did he do that? He yells at them from the room. So he's sitting in this room by himself behind these locked doors within the bowels of the police station. And he's initiating contact when he yells something like, how do I get out of here? Or what's going on next? Well, no, he just yelled about, I need to do something about the car. Okay. Logistics, which initially turns back into him talking about the case. And he does so for multiple more hours. Now, that's the problem. He voluntarily stays there for nine hours in the police station. I mean, that. I mean, if we want to assume for the argument that he was in custody, that's still, if he's in custody, then the police must scrupulously honor his right to remain silent. I'm saying they did until the defendant re-initiated contact on February 7th. So we're talking about him, we will deem it re-initiated contact when the guy is sitting alone in this room. And nothing is happening to him. And he yells to get their attention. That's re-initiated contact. How about, I just want to get out of here. I want to do something else. He doesn't say, I want to get out of there.  He's in the control of the police. OK, so again, we'll assume he's in custody. The police scrupulously honor his right to remain silent until he re-initiated contact. Well, Rhode Island versus Innis made it clear. The US Supreme Court said, interrogation doesn't just mean questions and answers. It's a context. So that when the cops come in and they start talking to him some more about this case, which is clearly designed and achieved the idea of having him respond, it's the cops who are initiating this discussion. He just says, what about my car? They could have said, well, you can call someone, or he can leave, or whatever. If that's what, that would be honoring his request to not talk further, wouldn't it? He said, we're not worried about the car. You can do whatever you want about the car. Well, see, but he's sitting in their control inside the police station. So what does that mean? What would that mean to a reasonableness of man? The car is beyond your control. Maybe he can reach someone by phone. But apparently that means, I can't walk out and get to the car and leave. Isn't that what it means? OK, again, we're assuming that's for custody. And the further discussion, we're just talking about, how about them cubs, or what? Well, the cops are asking him questions to get a dialogue going about this case, aren't they? Correct. Isn't that improper? Not if they scrupulously honored his invocation of record and make silent earlier. So the scrupulously honoring it is walking away from the room and leaving him there until such time as he screams, what's going on, or something about my car? I mean, it was only minutes later. But yeah, I mean, that could have been a ruse for a defendant. The defendant clearly wanted to keep talking about it. He talked about it for multiple hours after that. He didn't say, I want to stop talking. So he's having a great time. He wants to spend nine hours sitting in the police station. Everything's fine. No. I'm not saying he's having a great time, but he didn't. He clearly re-initiated contact. But this is the trees instead of the forest here. I agree. Let's go to the February 10th interview. As Justice Steinman, I think, was getting at, if we're assuming that the earlier February 7th and 8th statements were erroneously admitted, it was harmless error beyond a reasonable doubt. February 10th is the one that incriminated the defendant. I want to ask you the same question I asked Mr. Bell because this is troubling here. And that is, I think the fundamental issue here is assuming that what the cops did was wrong. It didn't matter his requests on the 7th or 8th. It's the same cops in the same manner, $40 later, coming in and asking questions. And they've given them random orders. No question about that. And he clearly understands them. But the question is the taint associated with the failure of the cops to respect his previous statements, where he said, I don't want to talk anymore, maybe we should get a lawyer, whatever. Viewing this in the light of a normal person, why wouldn't it be entirely reasonable for that normal person to view these February 10th Miranda warnings as not being particularly significant because these same two guys in the same manner ignored my previous statements of I don't want to talk. Well, I think the February 8th interview was relatively short as well. And February 10th was extremely short. This wasn't a marathon. Well, the 7th, going back to the 7th and 8th, you know, here you are again. I said I wanted to talk to somebody. I don't want to talk to you. And you continued to talk to me. Now you're telling me I don't have to talk again. Why wouldn't the defendant view that as just a lot of blather, amounting to nothing, that he's going to be sitting there for another nine hours? I took the February 10th as the defendant initiating the context. I mean, he said, are you ready? And then, instantly, he left. I'm not being clear. I want to focus first on the moment in February 10th when the cops give him the Miranda warnings. The question is, did he understand those and knowingly waived them? Yes. Okay. In determining whether he understood them and knowingly waived them, to what extent does the taint of the previous disregard of his choosing to remain silent by the same cops affect whether or not we should give value to his claimed waiver of the Miranda warnings on February 10th? In this case, they're not much extended at all for multiple reasons. First of all, the long gap, which was 48 hours. That's longer than any authority that I cited. I mean, the Colley case was a three-hour gap between the legal questioning and then the admissible statement. Well, how long should the gap be? Well, it should definitely be at least 48 hours. I mean, there's no authority I've seen that says that a cop questioning a victim or being a defendant two days later is still part of the same line of questioning, especially if there's fresh Miranda warnings, which there was twice in this case. The defendant confessed after both sets. This was clearly, and again, looking at the video, it seems like the defendant was ready to spew, ready to get this off his chest. I mean, again, this wasn't after 24 hours. Well, you said defendant initiated the February 10th interrogation. What do you mean by that? He's in jail still. I'm saying it sounds like he's ready to talk, and I think the video backs that up. Yeah, but, okay, just to clarify. He didn't send word out to the police officers, hey, I want to talk some more about what we talked about on the 8th and the 7th. They came to him and said... There's no evidence of that. The evidence is he's in jail, they go and talk to him in the jail, and they've accessed him. Okay. Again, this is... So just to further his question, it's not as if he called the jail and said, hey, those two guys have been having so much fun with us the last couple days, let's talk some more. He said it back. Two days ago, not the last couple days. That matters. That's not the conversation. You know, should we be troubled at all by the fact that if he had counsel or we know anything about counsel on the UUW charge? No, the record is silent on that, on counsel. Besides, I would submit, and I already did in my brief, that he didn't clearly and unequivocally invoke the right to counsel on February 7th, even assuming it wasn't testimony. It didn't sound like he said, I don't want to talk anymore. No, he said, I know where this is going. He puts his hands out. He puts his sleeves up like a sweet hand. Yeah, but he says at some point, I don't want to talk. Well, that's a different part of the interview. Okay, I know. The point being, the February 10th, they didn't go to the jail and say, hey, we're going to be here all day. It was within minutes, the defendant confesses. So, and he did it after fresh Miranda went both times. Yeah, but how do you answer the argument that they wore him down? They held him in there nine hours on February 7th. Then they talked to him again on February 8th. Briefly. And then they don't give up. They come back on February 10th. And so he's like, I've been Mirandized all these times. What difference does it make? They're not going to honor my rights anyway. And he confesses. So they wore him down. And it was repeated rounds of questioning. I mean, I think you could, I guess you could make that same argument in any case, any case like Mobley or there's no indication that that was the case here, especially with how quickly the defendant did confess. How would a defendant ever show that that is what happened? Oh, maybe, I mean, he talked for a long time on February 7th. Maybe he maintains his innocence like on February 7th for multiple hours. He didn't. He confesses almost instantly on February 8th. What about the alter in evaluating all of this? And if we're going to be involved in a harmless error analysis or maybe even a harmless error may have a reasonable value analysis, which I guess would have to be if we're talking about the Miranda violations. What about the ultimate strength of the state's case? To what extent is that an appropriate consideration? And what is the ultimate strength of the state's case here, other than just what the defendant said on the 10th? Well, like, yeah, there was a witness to implicated defendant. His accomplice implicated the defendant as the. . . Who says accomplice? Now, the accomplice, I recall, the accomplice gave a statement to the cops and then wouldn't testify. He testified. I didn't remember. So his fire statement implicated the defendant was brought out under 150-10.1? Yes. Okay. So we have essentially evidence before the jury of the accomplice saying, we did it and he shot whoever, however that worked. Other than the accomplice and the February 10th statement of the defendant, what other evidence you got? There was incriminating statements the defendant said to one of his friends days after the murder about dead bodies when the subject of his murder came up. And there was the fact that the defendant was caught with counterfeit money which was tied to the victim. So that would be an indication that he was there and got this circumstantial evidence linking him to the crime. And as well as his accomplice saying, yes, this was us, and by the way, the money wasn't real that we robbed from this guy. That's a pretty strong corroborating piece of evidence that the defendant wasn't being caught with counterfeit money and gave a nonsensical reason as to why he had it. When did he give that reason? Later, I think. I mean, later than Sanchez, which was his accomplice. I don't remember. Did the defendant testify in trial? I don't think so. Oh, so he never spoke of the counterfeit money in the February 10th interview, did he? No. At least not, I mean, like I said, the February 10th interview was short. Yeah. To whom did he give the bogus story about the counterfeit money? I'm presuming it was the year before. So they asked him about counterfeit money... The year before. The year before? I think he said he bought marijuana from the victim. I think that was in the year prior to the interview. Which he did leave on his own accord. So here's the question, picking up on Justice Turner's point. If we're troubled by what the cops did in this case, if we affirm this conviction, aren't we going to get more of it? I think this is directly in line with Brownell and Mosley. I think, and again, I've argued and I still believe that the police didn't impermissibly prolong these interviews. I think the defendant re-initiated contact on the 7th. I think he re-initiated it at the beginning on the 8th. Again, the 8th was a very brief, not relatively brief interview. I think it was an hour long or something. And then two days later, this wasn't a marathon, two-day questioning session where they said you're not getting out of here until you confess or anything like that. I asked you, as a technical matter, I don't know if I gave you a chance to respond, to what extent evaluating whether this is harmless or unreasonable, is it appropriate or are we required to consider the overall evidence presented? Well, not according to February 10th, I believe. No, just as a matter of legal doctrine, is this we have to evaluate all the evidence presented at trial? Well, yeah, to see if it was harmless beyond a reasonable doubt. Mainly it would be a sufficiency of evidence, I would say. Well, it's something we should consider.  Yes. Okay. Thank you, counsel. Mr. Malin, any rebuttals, sir? I imagine you do. I say I imagine you do, since we asked a lot of questions. And I also apologize, I asked you a whole bunch of questions and I didn't give you a chance to get into other stuff, but I think this is probably right in what we're interested in. Yeah, I think we've narrowed it down to key questions here. Let me ask, the last question I asked Mr. McNeil, do you agree that in the analysis determining whether trial errors harmless beyond a reasonable doubt, we ought to consider the overall evidence presented at trial? Yes. Is his recitation of what that evidence was pretty accurate? What the accomplice said? With what the accomplice said, yes. He gave some statements that came in. He said that he did remember the statements of the police and the media. But the jury heard it all? The jury heard that. There were some discussions about the counterfeit money. It wasn't exactly clear, but I'm important. But in any event, he's got counterfeit money and it was sliced into the seat. But within the statements, I mean, the person who was the victim in this case was a drug dealer, was a marijuana dealer. And there was a lot of testimony, at least in the statements, about there was a lot of counterfeit money floating around. So I don't know if that was. Okay. I've asked enough questions to give you a chance to go ahead. So as to the admission, I'll just get right to the admission. You can review on a technical analysis one of the factors. When you view this case, when you step back and see the forest with the trees, I really don't think there's any way to get around the fact that he would not have confessed to murder on February 10th if he had been afforded the protections of Miranda on February 7th. I also quickly, just to reiterate what occurred here, I mean, he's taken into custody. He invokes his right to silence. Four minutes pass. And what happened was he didn't reinitiate. He just said, I would like to make a phone call. And it's well established in the law that that's not the initiating interrogation. They get right back into it. Eventually he says, I don't know what you want to tell me. I'm done talking. They leave him alone for 17 minutes. Come back in and start talking to him. They leave him alone again another time for 34 minutes. At that point, he's just talking to himself. The police come back in. They're like, are you trying to talk to us or are you just speaking to yourself? He's just speaking to himself. Then they keep trying to wear him down. They're methodical. All along they plan to deceive that you have to speak to us and you have to give us a confession. Counsel, why wouldn't this court be justified in relying upon the Illinois Supreme Court case of Brownell to say that the February 10th statements were properly admitted? Well, because the February 10th statements here were, they wouldn't have occurred before the Miranda violation. This was a case where they were following it. I'm not following you. I thought Brownell said even if there's been a violation, if there's enough time and there's new warnings, then a court could be justified in allowing the statements made at the subsequent interrogation. So my question is, why couldn't we rely upon Brownell and make that finding? Well, in this case, yes, there was fresh Miranda's and there was time elapsed. But when you look at the techniques that were used by these police officers, when you look at the pattern they followed and the tactics, it's somewhat analogous to the ask first, warn later techniques that were discussed in Griffin. It's the same effect here. This was just violating Miranda, but then eventually get them to a point where you can give me Miranda's and then get them to confess. But the problem is, in such a scenario, the Miranda's are just completely ineffective. The time that elapsed before the last interrogation and the fresh Miranda's are really a nullity based on the conduct of the officers in this case. I mean, the techniques, the way they repeatedly, and every single time, they left them alone longer and longer to think about it. So, you know, they left them alone one night to come back, you know, I will confess tomorrow at 5. We're going to leave you alone for two nights, and then you come back. And you give your Miranda's, but at that point, the purpose is Miranda's. You seem to be turning that on its head, though. I thought the cases say the longer time period in between the interviews favors the prosecution, not the defense. You're just arguing now that I kept waiting a little longer and longer, and by now they broke in. I would say look at it in the context in the way the police conducted themselves throughout the course of the whole few days. And it follows the pattern, which makes this seem as if it was just one long interrogation that was snowballing upon itself until the police got them to confess the murder. Thank you, counsel. Time's up. We'll take this matter under advisement and lunch recess. I want to mention.